All rise. Clerk, will you call the next case, please? 315-215, people of the 307-9, Epley by Mark Oswald v. Javier Pulido, appellant by Robert Kirk. Mr. Kirk. Good morning. Thank you. Your Honors, this matter, the first argument we'd like to make on behalf of Mr. Pulido is that the trial court erred in only partially granting or partially denying the defendant's motion to quash arrest and suppress evidence. At a pretrial motion, the trial court quashed Mr. Pulido's arrest, suppressed statements that he made subsequent to his arrest. However, the court did not suppress. Narcotics recovered from within Mr. Pulido's vehicle some 35 to 45 minutes later after the stop. Factually, the defendant was stopped on I-80. He was stopped and issued a warning citation for speeding. Within about three minutes of the stop, a canine officer and his handler, another trooper, arrived on the scene, conducted a free air sniff of the vehicle while the arresting officer was issuing a warning. Sometime before the officer or the trooper finished issuing his warning, the canine sniff was complete. Evidence was elicited at this pretrial motion regarding whether or not the defendant consented to a search of this vehicle. We argue that there is no evidence of consent at any point in time. After the warning citation was issued, the troopers conducted a hand search of the vehicle. The issue here is whether or not that hand search was supported without a warrant by probable cause. And in this case, the appellant, Mr. Pulido, argues that troopers did not possess probable cause to conduct a search of that vehicle. Although the canine handler testified that the canine trooper hit on the vehicle and alerted to the vehicle, and the video shows the canine walking around the vehicle and signaling to the driver's side door of the vehicle, we argue that the search of the vehicle based upon this canine sniff alone is insufficient. In the case of People v. Lickweiler, 2014, ILAP 3rd, 120431, this court held that it is the state's burden to provide proper indicio of reliability regarding the drug dog's alert. In that case, the court considered evidence of certifications. In this case, the dog was not certified. In the Lickweiler case, the dog had been in duty for, I believe, 10 to 12 years. In this case, the dog had been on duty for less than two years, and a significant portion of that time the dog was out of service due to an injury. The dog in this case was certified in May of 2012. That certification expired in May of 2013, and the search in this case was conducted on June 11th of 2013, at least a month after the certification expired. In Lickweiler, this court considered certification. In this case, the dog was not certified. In Lickweiler, the court considered field performance. In this case, the trooper could not testify to any degree of certainty as to the canine's reliability in the field. And it wasn't that the defendant chose not to question the officer. The defendant subpoenaed the records. The trooper appeared in court and testified on more than one occasion without any accuracy records. The trooper testified that when it comes to field exercises on duty, that in addition to creating reports that are discoverable, the trooper also testified that he kept his own notes on his own computer regarding the accuracy of the dog's performance in the field. And when the defense questioned the trooper regarding the dog's accuracy in the field, the trooper admitted that he had not calculated that information and that he wasn't able to testify as to the canine's accuracy in the field. In Lickweiler, this court also paid particular attention and commented on the value of control testing, testing outside of the field, training exercises. And just as it was with respect to testimony about field performance, the trooper in this case could not testify as to any degree of reliability with respect to canine Rico's performance in controlled tests. This court held or commented on the proposition that controlled tests are a better measure of a dog's reliability. And in Lickweiler, the trooper was able to testify and evidence was elicited as to the dog's performance in controlled testing. And there was actually percentages, 66% reliable versus 33%, perhaps unreliable. In this case, we have no percentage as to the canine's reliability, again, because the trooper wasn't able to calculate the same. He testified that he kept his own notes. He testified that he kept records of each and every controlled test. He was subpoenaed to produce those. He did not produce those. And he was unable to testify as to the canine Rico's performance in controlled testing. In this case, the trooper, Trooper DeGraff, it was, was unable to establish Rico's reliability in the field or in a controlled environment. He was unable to testify as to success rates. He actually testified. The one thing he testified specifically to with respect to controlled tests was that there were times when Rico was unable to finish the training exercises because he had become distracted. We know that for sure. We know for sure that the trooper did not calculate any ratios as, with respect to false negatives. He also testified being unable to calculate ratios of unknown responses, which were characterized by the defense as false positives. He also testified that there's no difference in Rico's alerts between guns, which he testified did not possess an odor, but the dog would detect the odor of a human on the gun. He could not differentiate between the alert. Rico would give between a gun or drugs or going to the bathroom or being hungry or being playful. In this case, the trooper documented in his report that was tendered in discovery one stop on the side of the road on I-80. The walk around, as I indicated earlier, was conducted within a few minutes of the stop and then a hand search commenced where, for over 20 minutes, troopers conducted, outside of the canine's presence, a hand search of the vehicle with negative results. We know that Rico, in this case, alerted to the passenger side door on the side of the road. He did not, Rico did not alert to the engine compartment, which is where the narcotics were ultimately recovered. Trooper DeGraff only documented that first search. A subsequent search was commenced at the Shanahan Police Department and that is the issue that the appellant may assert here in our argument. Mr. Kerby, before you leave the dog, where does the requirement for annual certification come from? There is no requirement for annual certification. However, the trooper testified that the certification that Rico was awarded in about May of 2012 was only valid for one year. What determines how long the certification is valid? The trooper testified that the certification that Rico earned was only valid for one year. He did not, the trooper did not testify as to what determines or how the length of time for which a certification is valid. Our argument is it's the state's, we shifted the burden to the state to prove that Rico was reliable and that it's the state's burden to prove proper indicia of reliability and it was the state's witness, Trooper DeGraff, the canine handler, that testified as to certifications and how long they are valid. So your argument is that a month out from the expiration of the certification, he's no longer officially certified. What I'm trying to find out is what that means. One of the issues that the court addressed in Litweiler were not only the certification and the length of time it's valid for, but also these training exercises. And in this case, Trooper DeGraff testified that twice a month, 10 hours each day of those months, so about 20 hours a month, a canine handler and his canine partner participated in exercises. And in this case, it's not just the month after certification expired that's important, but it's also the time in which Rico, the canine, was out of service. He was out of service October, November, December. I believe it wasn't until January that he resumed service. And when we questioned the trooper about his reliability in those exercises, those exercises that he was able to participate in, the trooper could not calculate to any degree as to Rico's reliability. The trooper did not want to characterize it as a false positive. He wanted to call it an unknown response. He couldn't testify as to how many times Rico gave an unknown response. He couldn't testify how many times Rico exhibited a false negative or failed to respond at all. There is a second search that is critical to the appellant's argument here, and that's the search at the Shenanigans Police Department. And here we have a search that the trooper didn't document at all in discovery. He only documented the search on the side of the road that this detention roadside lasted for about 30 minutes. And the appellant's argument is that if his arrest was unlawful, and if his detention, after 30 minutes being on the side of the road, without any confessions, without any contraband and clean view, without any physical evidence or evidence yielded by the hand search, if his arrest was unlawful after 30 minutes on the side of the road, and the trial court found that it was, and if all evidence recovered from the defendant himself after 30 minutes at the Shenanigans Police Department were fruits of an illegal search, then so too was the transport of his vehicle. Officers on this video searched the vehicle, inside, outside, engine compartments, underneath, glove boxes, trunks. In the search at the Shenanigans Police Department, Rico is alerting to the rear of the vehicle. And he's alerting to an area of the vehicle again in the second search, which was not documented by the trooper, alerting to an area where drugs were not recovered. And the trooper would have him believe that the flow of air throughout a vehicle is what causes a dog to alert in a place where narcotics are not recovered, which is a fine explanation if we knew what Rico's reliability was. It is the state's burden, and through the trooper, the state's witness, it is the state's burden to prove Rico's reliability. In this case, the state failed through Trooper DeGraff in that regard. Counsel, I have two minutes. Thank you. Essentially, if Mr. Pulido's detention on the side of the road was illegal, then so too was the transport of his vehicle to the Shenanigans Police Department. I'll conclude this portion of my argument by saying this. If the warning ticket was issued, and then the search commenced, which is what the troopers testified to, and if that search did not yield evidence enough to detain Mr. Pulido, then upon what was the transport of his vehicle, and the further search and intrusion upon the privacy of his vehicle warranted upon, the state may argue it was based upon prior crimes. The prior crimes evidence came in through Detective Copolio, who testified that he lied before the trial court. He was impeached in his own testimony several times throughout pre-trial motions, and without proper, or I should say without a reliable dog sniff, and if you're going to base the other search and seizure upon prior crimes, Copolio did not demonstrate any more reliability with respect to the other crimes than did DeGraff and Rico with the canine sniff. Mr. Kerr, I'd like to ask you a question about something that I personally have never seen in one of these traffic stop cases, and that is the testimony that the officer stopped the car because he was directed by another policeman to do that. So it sounds like this was not a routine traffic stop, it was basically a subterfuge for the continuation of an investigation. Is that correct? That's absolutely what this was, and Copolio, the detective that directed DeGraff and then Carando to conduct this stop, Copolio initially testified that there weren't any prior crimes that he was aware of, and when pressed in the middle of a pre-trial motion, he finally acknowledged that there was other information, and the state's explanation to the trial court for Copolio's flat-out lying before the trial court was that, well, Judge, he's just doing his best to try to help the state, or something along those lines. After those materials were disclosed in the midst of a pre-trial motion, then it became quite clear that the officers were conducting an investigation, we would argue that the particulars of that prior investigation are not sufficient or reliable to conduct the search and the intrusion that resulted in this case, but certainly officers, after disclosure was made in the midst of a pre-trial motion, clearly acknowledged that this is an ongoing investigation and that the traffic stop was just a pretext for something else. And we know that's true because Trooper DeGraff, the canine handler, arrived within about a minute or two, according to his testimony and what the video shows, within a minute or two of what was supposed to just be a speeding or a traffic offense, wherein the defendant was gauged traveling, I believe it was, 67 miles an hour on an interstate. What it looks like is an attempt to avoid continuing your investigation by getting a search warrant. Absolutely. For a judge and getting a search warrant. Do we treat this as an ordinary traffic stop? This was not an ordinary traffic stop. This is a traffic stop on June 11th that actually started on June 5th. And between the dates of June 5th and June 11th, no member of this team made any effort, according to their own testimony, to apply for a search warrant. We had, on the June 5th date, the date on which officers allegedly commenced this investigation against Mr. Polito, we have 13 or more agents from different jurisdictions, from different states, participating in a surveillance exercise without a camera, without a video, without conducting any photo arrays, without producing any particulars as to where or when these drugs were being transported, to whom they were being transported, the prices of these drugs. There wasn't any money exchanged in this case. This traffic stop was nothing more than an attempt to avoid having to apply for a warrant. And it was certainly a search that was executed without probable cause. So in reviewing this case, do we apply the regular traffic law cases? Or is there some other law that we apply? Well, Judge, in this case, there was a seizure. And we know that there was a traffic stop. And traffic stops are a seizure, and the Fourth Amendment applies, and tariff principles apply. In this case, we know that the warning citation was complete and issued, although they couldn't produce it until trial. We know that the warning citation was done. It was written. It was signed for before the search, the hand search, commenced. So our argument is that the traffic stop was complete within about five to seven or so minutes after the initial stop. And the troopers agreed that the hand search did not commence until after that point in time. So this is the search that was conducted here had nothing to do with the traffic stop. The search that was conducted here is similar to the searches that were conducted in Peoples v. Pulling and Peoples v. Ruffin. These were searches that were conducted separate from and unrelated to the traffic stop. And, in fact, in this case, unlike those cases, Mr. Polito did not conduct himself in any way that was suspicious. He didn't give any conflicting statements. There wasn't evidence like there was in, I believe it was, Ruffin of cannabis or an admission of cannabis being in the vehicle. There was nothing of the sort. And are we sure he was speeding? We're not. Okay, thank you. Thank you. Thank you, Mr. Curran. Mr. Raskin. May it please the Court. Counsel. The defendant argues that the trial deterred when partially denying the defendant's motion to quash and suppress evidence. And he claims the trial deterred when finding that the first prong of the Terry inquiry had been made. This is not an argument today, but in his brief, of course. And our Supreme Court in Harris said that the two Terry prongs are whether the stop was justified at its inception as to whether the officer's actions were reasonably related in scope to the circumstances that initially justified the stop. And the scope of inquiry, of course, is limited to whether the police impermissibly prolonged the stop. As to the first prong, Trooper Corando testified that he testified at his LIDAR unit at the start of his shift. It was working properly, and the LIDAR showed the defendant was traveling seven miles per hour above the posted speed limit. He was going 72 in a 65 zone. Corando did issue a written warning in this case. Thus, the traffic stop was justified at its inception. And the trial judge correctly found that the first prong of Terry had been met. And the defendant claims that Corando's decision to issue a warning showed that he did not find the defendant's driving to be suspicious. And Corando told the defendant that if his license and paperwork checked out, he would write a warning and the defendant would be free to leave. People cited case law on page 16 of our brief stating that an officer has wide discretion whether or not to write a ticket. And people met their burden of proving that the defendant had been lawfully stopped for speeding, and the seizure was legal from its inception. Corando merely exercised his discretion when choosing not to issue a ticket, but rather issued a warning. In his brief, the defendant asserts that the traffic stop was unduly prolonged. In the Supreme Court case of People v. Rodriguez, mandates his conviction should be reversed. The defendant claims that under Rodriguez's detention was not reasonably related in scope to the traffic violation. Ms. Drostel, do you find any significance in the fact that he stopped him because he was told to? Well, the significance in that case would be that DeGraff had information from the Narsink Group. They had that prior exchange of methamphetamine about a week earlier off I-80. And so they knew that defendant, they knew the vehicle he was driving, they knew from that exchange that there was likely to be drugs in the vehicle. And they were also working with an Iowa group. Now, some information was provided to DeGraff, but that same information was not transferred in full to Corando. He just said, we're looking at this guy to see if he can stop him. So, Corando doesn't have full information. He just knows that there's something going on. So, he sees him commit a violation that gave him proper grounds to pull the vehicle over. So, Corando's stop was good. He was not involved in any kind of mechanizations to any subterfuge, as you put it. But he was told to stop him. Sure, DeGraff instructed him to stop him if he can, basically. He didn't say to stop him illegally. He was basing his information on broader information that he had been provided. But he was a targeted stop. He was, yes. We're not going to deny that it was a targeted stop. But the issue is, did a defendant in Corando's presence violate the traffic law? That's all Corando needed to know. He had been directed to stop the individual, but he didn't know why he was stopping this individual, because he didn't have that complete background information. So, Corando had proper grounds to stop this individual and issued either a ticket or warning, and he did so. Okay. As I said before, I've never seen this in a case before, so I'm pushing it a little bit because I'd like to understand. It strikes me that if he was stopped as part of this other investigation, that maybe the law that we apply is not actually the traffic stop law, but something else. Well, I understand your position, Your Honor, but we have to consider this from the point of view of Trooper Corando, not necessarily the narcissist agents who had all this background information in that task force. But Trooper Corando was directed to stop them. Correct. But he didn't do it without seeing a violation. He could have followed him for miles and never seen any violation. What was he going to stop him for? Nothing. It would have been a bad stop. He would have known that. In this case, he saw the man speeding seven miles above the posted speed limit. The stop is valid, and I understand your point that there was certainly background information here, but that doesn't make the violation go away. There was still the traffic violation. Trooper Corando still saw it, and he didn't know why he was directed to stop this individual. So, yes, in that respect, it was a little unique. Most people aren't saying, hey, go stop this guy for some reason. But I contend that he wouldn't have stopped him had he not seen the violation. It wouldn't have been proper. It wouldn't have held up in court. If anyone knows that who's been on the force for any period of time, I'm sure, on the highway patrol, state police, would know that they have to have valid grounds to stop an individual. So he happened to see it, defended it, provided those valid grounds by speeding. And so I think we still have to apply the traffic law and the Terry stop principles, the Harris principles to this stop. Can we fast forward them to now that the stop's over and the first search is over? What is the ability? I mean, what's the probable cause to take this vehicle now to the police station and carry it apart? That is where I'm struggling with this. I mean, is that in a case where there isn't an investigation, is that standard? Or they search a vehicle, they come up with nothing, there's not any hidden compartments? So, I mean, is it routine then to say, we can't arrest you, but we're going to take this vehicle because this dog alerted and we searched it for over half an hour, but we think there must be something here, so we want to pull it apart. I guess I'm struggling with that. Is that something that is routine or that they would always have the ability to do after a dog alerts and then they find nothing? This case is a little unique in that there was a lot of background information by some of the agents before they obtained the vehicle. We have to remember that you can see on the video, we first have a consent to search, which is an important thing here. We have a thumbs up, we don't have any verbal, I don't know. Well, it's hard to hear on the video. I believe you do hear an uh-huh kind of consent, but not an actual yes, you can search my vehicle type of consent that was so clear and obvious. Unfortunately, defendants don't plan ahead to present this evidence for trial. In this case, if I listen carefully, I won't swear that I heard an uh-huh, but I believe I did. And then, you know, Truper Carando, of course, testified that he was given the consent and there was no one testified to the contrary. And the thumbs up, they said that it was their routine practice between those two officers when they worked together. If Carando gave a thumbs up, that meant that consent was given, so then they started to search. And that was all done after the warning was done, so the traffic stop was not prolonged, you know, in the sense of, I think it was pulling, where the officer actually stopped. There was a case before this court where the officer actually stopped the writing of the warning in order to conduct the dog sniff, and then, you know, so he obviously continued. But here, everything is done. And according to the officer, Polito consented to that search. There was obviously the dog sniff that was conducted before the traffic stop could have even been completed because the lead search had not come back yet. The dog alerted the way he was trained to alert for drugs. There is a different alert for guns. He lays down on guns and other types of contraband. But for drugs, the dog changes breathing patterns and such, and then sits down, looking at the vehicle. In this case, he jumped back up, and the officer de-graphed it. Eventually, I had to pull him off the vehicle. So that was a clear alert there was something going on in the vehicle. We have, it's dark, almost dark. It's late evening. It's on the side of I-80. It's starting to rain. The officers didn't rip the car apart. They did what would be a view search, open trunks to see if there's anything in sight, lift something up if it's not there. So they didn't do a complete search of the vehicle. So they still had reasonable grounds, probable cause, to take the car in and do a more thorough search in a safe condition. And at the Cheyenne Police Department, the defendant gave a written consent. So there was a clear, we don't need a search warrant, because we've got the clear written consent to search the vehicle. I'm sorry. Where did the probable cause come from to take the car to Shamhound? Well, because of the dog alert. They exhausted the dog's alert. They did the search. They didn't find anything. Where was the probable cause to do anything more? They hadn't done a complete search because of the conditions. They hadn't ripped the car apart? They hadn't done a complete search? Well, there is more to be searched. They didn't take anything apart in the engine compartment at all because, as I said, it was starting to rain, it was dark and such. Your Honors, we can't discount that there was other information. I understand where you're coming from. Are they using the probable cause from the other information? To some extent. I believe the NARSA agents, once they arrived on the scene, did have this additional information that he had produced something from the engine compartment, you know, the methamphetamine. And so they had information that they could provide which enhanced probable cause. We had the dog sniff. We had this other knowledge that's imputed to the other officers too, especially when they arrived on the scene. How long does the probable cause last? How long does it last? I mean, can it go days? Well, no, I agree that it just can't go on and on and on and on. How long does that dog sniff probable cause give them? Just long enough to do a thorough search. I believe the whole incident, if I'm trying to remember the time frame off the top of my head, including the transport, which was short, was somewhere around 45 minutes, I think. The record may correct me, but I believe that's accurate. From the stop to finding the drugs? Yes, sir. Yes, Your Honor. Including the transportation to the jail? It was a very short drive. I think it was two to three minutes, if I remember correctly on that. So very close to Hanna for this. And one thing the defendant was talking about, the certification being unreliable, of course, it had lapsed in May 2013, just prior to the June stop. The draft testified as to Rico's ongoing training, and that Rico had participated in about 50 investigations in the field. He did not have complete records, you know, detailed ratios and such that he kept. But he said that Rico had never given, or I'm sorry, had given unknown responses in training, which is where the reason for the alert is later discovered. But Rico had never given a false positive by alerting on a training blank that had never had any kind of drugs in it whatsoever. The fact that he couldn't quantify it doesn't change the never part of his testimony that says the dog had never alerted to a false positive where no drugs had ever been in it. Rico did miss the winter certification because of a broken leg, but he was recertified in July 2013, just a month after the stop. So the defendant would have us believe that between May and July the dog was totally unreliable, but all of a sudden became reliable at the end of July, and I don't think the testimony would support that. I thought his point was that it was the state didn't meet its burden of proof, not that the dog may not have been qualified to do something. I think just relying on, I believe the state did meet its burden of proof because of the officer's testimony about the training methods, the amount of time trained, the lack of false positives, the fact that every time the dog had an unknown response, it was later discovered why there was an unknown response. So it wasn't a false positive, the dog always was accurate in training. So I think that testimony alone is enough to support that the dog was still reliable at the time of the traffic stop. I want to ask you one more question. If I'm driving on the highway and I get stopped because I'm speeding, which I am wont to do, and a dog alerts, are you saying that the police at that point have the right to completely dismantle my car because of the dog alert? I don't think there's any case law to support that. I would say no. Okay, then I'm still wanting to know where the probable cause is from the dog alert to go beyond the search that they had already done where they found nothing to take the car into Shanahan so that they could dismantle it. I think in this case, because we have that additional information from the other task force that they had been provided the drugs, that added to the probable cause. If we're just taking the stop alone with no other information, if they couldn't find anything at that time, then I agree that likely there would be no probable cause to take the car in. But in this case, we had that additional information that the defendant from that vehicle, from the engine compartment, had provided methamphetamine. He was driving alone on the highway in the same vehicle, and there was an alert so that it all ties together. And we have to remember that the conditions weren't great on the side of the road. If it was really clean conditions, I'm sorry, you were about to ask a question. So they were following up with this search because of probable cause that they had from an investigation that they had chosen not to get a warrant for to pursue. I don't know if choosing not to get a warrant is supported by the evidence in this case. I think because we had the consent to search, that we didn't have to have a search warrant under the case law. You would have had to have a search warrant to follow up your investigation, short of stopping him on the highway. But again, we had a second consent to search by Mr. Polito at the police department. He could have said, no, you're done here, you've already searched my car, I'm going away. And the police could have just said, you're right, goodbye, and sent him on his way. But he gave the second consent to search. Do you have any other questions, Your Honor? To answer Your Honor's question, if this court upholds the trial court's finding with respect to the pretrial motion, then probable cause after an investigation on the border can last up to or more than seven days, without any intervening circumstances. The prior crime, the June 5th investigation, started somewhere around the border of Iowa and Illinois on June 5th. And to answer your question, if this court upholds the trial court's ruling with respect to the vehicle, then probable cause exists without a warrant and without any other intervening circumstances or information for at least six or seven days. Because that's how many days pass without new information before officers took Mr. Polito's vehicle from the side of the road, after searching it for 30 minutes, conducted another search without consent and without a warrant. And so if this court does not disturb the trial court's finding, none of us driving on I-80 are safe, because what is a criminal investigation that must be supported by a warrant or probable cause can be run around with a traffic stop. Officers could have, on June 5th, 6th, 7th, all the way up to 11th, applied for a warrant. They didn't. And in this case, they didn't have any other information to justify the search. If Mr. Polito should have been released on the side of the road, then so too should have his vehicle. And officers are not without tools to pursue the investigation that commenced on June 5th, continue following him, continue to observe other traffic violations, continue to gather other information, cultivate the sources that led you to Mr. Polito in the first place. But officers did not do that. And what's different about this case from others is that the canine was waiting in the wings right there within a minute or two of the traffic stop. And so clearly it wasn't a traffic stop. And if officers are permitted to conduct every traffic stop that has a canine in it, then the court's holdings on this issue won't really apply. What we need to pay attention to here is not just the free air sniff, but the prolongation after the free air sniff. After the free air sniff with only an alert by a dog that the state failed to prove was reliable and nothing more. It's the hand search that followed the free air sniff that unreasonably delayed Mr. Polito's detention. And even beyond that, 30 minutes they leave the roadside. It's 8 to 10 minutes the troopers testified to Shanahan. So that's about 38 to 40 minutes before they even get there. And then a second sniff is conducted. And then a car is torn apart. And we know the second sniff hit on the rear of the vehicle. And we know that rear was torn to pieces. And I don't believe the record is clear as to how long it took them to circle back to the front of the air compartment. But we're talking about a seizure of at least, at a bare minimum, 40 to 45 minutes before we're even coming close to the front of that vehicle. Without a warrant, without probable cause. I would urge this court to disregard any arguments the state may make with respect to written consent that counsel referred to was obtained clearly at a point when Mr. Polito was illegally detained. The verbal consent counsel argued was evidenced by an uh-huh. I would argue is not even present on that recording. And the trial court did not find that there was consent for any search of this vehicle. So I would urge this court to disregard those arguments. And with respect to the thumbs up, we know this wasn't a routine traffic stop because Carando and DeGraff had exercised this thumbs up on at least 10 other occasions. So without even speaking about it, before even arriving there on the scene, these officers had it planned and in their mind that we are going to search this vehicle and a thumbs up means go ahead. And they both testified that they couldn't do it in their minds, however much that's relevant. They couldn't do this search without his consent. The consent isn't there. So I would urge the court to disregard those arguments. And based upon the written pleadings and oral arguments today, we respectfully request that you grant Mr. Polito's appeal. And we very much thank you for your time and consideration. Thank you, Mr. Carroll. Thank you. Thank you. There we go. Thank you, Mr. Carroll. Thank you for your argument today. We look forward to hearing your advisement. Thank you for the written decision to get a short break. And we'll now take a short lunch and recess, I guess. And we'll be back at 1.15. Good night. Good night.